Slip Op. 16-76

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HUSTEEL CO., LTD.,** | |
| Plaintiff, | |
| **NEXTEEL CO., LTD. and HYUNDAI HYSCO,** | |
| Consolidated Plaintiffs, | |
| **ILJIN STEEL CORPORATION, AJU BESTEEL CO., LTD., and SEAH STEEL CORP.,** | |
| Plaintiff-Intervenors, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 14-00215** |
| Defendant, | |
| **UNITED STATES STEEL CORPORATION, BOOMERANG TUBE LLC, ENERGEX TUBE (A DIVISION OF JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., and MAVERICK TUBE CORPORATION,** | |
| Defendant-Intervenors. | |

## OPINION

[Commerce's final results of remand redetermination in antidumping investigation sustained.]

Dated: August 2, 2016

Donald B. Cameron, Morris, Manning & Martin, LLP, of Washington, DC, argued for plaintiff.  With him on the brief were Julie C. Mendoza, R. Will Planert, Brady W. Mills, Mary S. Hodgins, and Sarah S. Sprinkle.

J. David Park, Arnold & Porter, LLP, of Washington, DC, argued for consolidated plaintiffs.  With him on the brief were Henry D. Almond and Yujin K. McNamara.

Joel D. Kaufman, Richard O. Cunningham, and Henry N. Smith, Steptoe & Johnson LLP, of Washington, DC, for plaintiff-intervenor ILJIN Steel Corporation.

Neil R. Ellis, Rajib Pal, and Shawn M. Higgins, Sidley Austin, LLP, of Washington, DC, for plaintiff-intervenor AJU Besteel Co., Ltd.

Jeffrey M. Winton, Law Office of Jeffrey M. Winton PLLC, of Washington, DC, for plaintiff-intervenor SeAH Steel Corp.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  On the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Claudia Burke, Assistant Director, L. Misha Preheim, Senior Trial Counsel, and Melissa M. Devine, Emma E. Bond, and Agatha Koprowski, Trial Attorneys.  Of counsel on the brief was Mykhaylo A. Gryzlov, Senior Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Jon D. Corey and Jonathan G. Cooper, Quinn Emanuel Urquhart & Sullivan, LLP, of Washington, DC, for defendant-intervenor United States Steel Corporation.

Roger B. Schagrin, Christopher T. Cloutier, John W. Bohn, Jordan C. Kahn, and Paul W. Jameson, Schagrin Associates, of Washington, DC, for defendant-intervenors Boomerang Tube LLC, Energex Tube (a Division of JMC Steel Group), Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Brett A. Shumate and Jeffrey O. Frank, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor Maverick Tube Corporation.  On the brief were Robert E. DeFrancesco, III. and Alan H. Price.

Restani, Judge:  Currently before the court is the U.S. Department of Commerce's ("Commerce") Final Redetermination Pursuant to Court Remand, ECF No. 240 ("Remand Results").  The Remand Results concern the final determination in the antidumping ("AD") duty investigation of oil country tubular goods ("OCTG") from the Republic of Korea ("Korea"), covering the period of investigation ("POI") between July 1, 2012, and June 30, 2013.  See Certain Oil Country Tubular Goods from the Republic of Korea:  Final Determination of Sales at

Less Than Fair Value and Negative Final Determination of Critical Circumstances, 79 Fed. Reg.

41,983, 41,983 (Dep't Commerce July 18, 2014) ("Final Determination").  The court remanded

this matter to Commerce to reconsider or provide further explanation of its mandatory

respondent selection and its calculation of the constructed value profit margin ("CV Profit") used

in determining the AD duty margin for the selected mandatory respondents, NEXTEEL Co., Ltd.

("NEXTEEL"), and Hyundai HYSCO[1] ("HYSCO").  Husteel Co. v. United States, 98 F. Supp.

3d 1315, 1325–32, 1337–49 (CIT 2015).  Commerce's Remand Results are adequately

explained, and its revised calculations are supported by substantial evidence.  Accordingly, the

Remand Results are sustained.

## BACKGROUND

The court presumes familiarity with the facts of the case as discussed in Husteel, 98 F.

Supp. 3d at 1322–23, but facts relevant to the Remand Results are briefly summarized here for

ease of reference.

A dumping margin is "the amount by which the normal value[2] exceeds the export

---

[1] On July 1, 2015, Hyundai HYSCO merged into its affiliate, Hyundai Steel Company.  Remand Results at 2 n.2.

[2] Normal value of the subject merchandise is defined as

the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.

19 U.S.C. § 1677b(a)(1)(B)(i) (2012).

price[3] [("EP")] or the constructed export price [("CEP")].[4]" 19 U.S.C. § 1677(35)(A) (2012).

Relevant to the calculation on remand, when a respondent, such as NEXTEEL or HYSCO, does

not have any home-market or third-country sales, Commerce calculates normal value using

constructed value.  See 19 U.S.C. § 1677b(e).  Constructed value is derived by applying a

statutory formula, and it includes the sum of the costs of production ("selling expenses") plus an

amount for profit (i.e., CV Profit), and other incidental expenses.  See 19 U.S.C. § 1677b(e); 19

C.F.R. § 351.405(b).  In calculating normal value using constructed value, Commerce's preferred

method is to include "the actual amounts incurred and realized by the specific exporter or

producer being examined . . .  for selling, general, and administrative expenses, and for profits, in

connection with the production and sale of a foreign like product, in the ordinary course of trade,

for consumption in the foreign country[.]"  19 U.S.C. § 1677b(e)(2)(A).  If such data are

unavailable, Commerce resorts to one of three statutory alternatives for calculating selling

---

[3] Export price is defined as

> the price at which the subject merchandise is first sold (or agreed to be sold) before
> the date of importation by the producer or exporter of the subject merchandise
> outside of the United States to an unaffiliated purchaser in the United States or to
> an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677a(a).

[4] Constructed export price is

> the price at which the subject merchandise is first sold (or agreed to be sold) in the
> United States before or after the date of importation by or for the account of the
> producer or exporter of such merchandise or by a seller affiliated with the producer
> or exporter, to a purchaser not affiliated with the producer or exporter.

19 U.S.C. § 1677a(b).

expenses and CV Profit.[5]  19 U.S.C. § 1677b(e)(2)(B).  The court will refer to these alternatives

as "alternative (i)," "alternative (ii)," and "alternative (iii)," respectively.

In February 2014, Commerce issued a negative preliminary determination.  Certain Oil

Country Tubular Goods from the Republic of Korea:  Negative Preliminary Determination of

Sales at Less Than Fair Value, Negative Preliminary Determination of Critical Circumstances

and Postponement of Final Determination, 79 Fed. Reg. 10,480, 10,480 (Dep't Commerce Feb.

25, 2014) ("Preliminary Determination").   For the Preliminary Determination, Commerce

limited the number of respondents for individual examination, selecting the two exporters or

producers of OCTG accounting for the largest volume of imports from Korea to the United

_____

[5] The three statutory alternatives for calculating CV Profit are:

(i)      the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation or review for selling, general, and administrative expenses, and for profits, in connection with the production and sale for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise,

(ii)     the weighted average of the actual amounts incurred and realized by exporters or producers that are subject to the investigation or review (other than the exporter or producer described in clause (i)) for selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country, or

(iii)    the amounts incurred and realized for selling, general, and administrative expenses, and for profits, based on any other reasonable method, except that the amount allowed for profit may not exceed the amount normally realized by exporters or producers (other than the exporter or producer described in clause (i)) in connection with the sale, for consumption in a foreign country, of merchandise that is in the same general category of products as the subject merchandise; [i.e., what is commonly referred to as the "profit cap."]

19 U.S.C. § 1677b(e)(2)(B).  The statute "does not establish a hierarchy or preference among these alternative methods."  Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 840 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176 ("SAA").

States:  NEXTEEL and HYSCO.  Respondent Selection Mem. at 6–8, PD 80 (Aug. 27, 2013)

("Respondent Selection Memo"); Decision Memorandum for the Negative Preliminary

Determination of Sales at Less Than Fair Value, Negative Preliminary Determination of Critical

Circumstances, and Postponement of Final Determination in the Less-Than-Fair-Value

Investigation of Certain Oil Country Tubular Goods from the Republic of Korea at 3, A-580-870,

(Feb. 14, 2014), available at http://enforcement.trade.gov/frn/summary/korea-south/2014-04110-

1.pdf (last visited July 27, 2016) ("Preliminary I&D Memo").  Because the two mandatory

respondents did not have viable home or third-country sales of OCTG, Commerce used

constructed value to calculate normal value.  See id. at 3, 20–21.  Commerce determined that the

data to calculate CV Profit under 19 U.S.C. § 1677b(e)(2)(A) were unavailable, and accordingly,

that it had to rely on one of the alternatives listed in 19 U.S.C. § 1677b(e)(2)(B).  Id. at 21.

For HYSCO, Commerce calculated CV Profit using alternative (i) and HYSCO's own

home-market sales of non-OCTG products.  Id. at 22.  Commerce then compared the resulting

normal value to CEP, because "HYSCO reported that it [sold] the subject merchandise to a

wholly-owned subsidiary in the United States,. . . which then sold the merchandise to an

unaffiliated customer."  Id. at 15–16, 19.  For NEXTEEL, Commerce preliminarily relied on the

profit recorded in certain Korean OCTG producers' ("Korean producers") financial statements

under alternative (iii), and compared the resulting constructed normal value to export price.  See

id. at 15–16, 20, 22.  Commerce calculated preliminary dumping margins of zero for both

mandatory respondents.  Preliminary Determination, 79 Fed. Reg. at 10,481.

After the Preliminary Determination, Commerce permitted the United States Steel

Corporation ("U.S. Steel") to place the 2012 financial statements of Tenaris, S.A. ("Tenaris"), a

multinational producer of OCTG, on the record as rebuttal evidence to NEXTEEL's

supplemental questionnaire response filed February 20, 2014.  See Issues and Decision

Memorandum for the Final Affirmative Determination in the Less than Fair Value Investigation

of Certain Oil Country Tubular Goods from the Republic of Korea at 28–30, A-580-870, (July

10, 2014), available at http://enforcement.trade.gov/frn/summary/korea-south/2014-16874-1.pdf

(last visited July 27, 2016) ("I&D Memo").  Although Commerce permitted U.S. Steel to place

the Tenaris financial statements on the record, Commerce did not allow the other parties to fully

respond to the Tenaris data or provide additional CV Profit evidence.  See id.; Husteel, 98 F.

Supp. 3d at 1343–44.

        In July 2014, Commerce issued an affirmative final determination, and calculated a

dumping margin of 9.89% for NEXTEEL and 15.75% for HYSCO.  Final Determination, 79

Fed. Reg. at 41,984.  Korean producers and exporters not individually examined, including

Husteel Co., Ltd. ("Husteel"), SeAH Steel Corporation ("SeAH"), AJU Besteel Co., Ltd. ("AJU

Besteel"), and ILJIN Steel Corp. ("ILJIN") were assigned a margin of 12.82%, the weighted-

average of the mandatory respondents' dumping margins.  Id.  Changes in Commerce's CV

Profit calculation caused this significant increase in the dumping margins.  For the Final

Determination, Commerce concluded that it could not rely on the profit from HYSCO's or any of

the other Korean producers' non-OCTG sales under alternative (i), i.e., profit for the same

general category of products as the subject merchandise, because their home-market sales of

predominantly line pipe were not in the same general category as OCTG.  I&D Memo at 16–20.

Commerce then calculated CV Profit for both NEXTEEL and HYSCO using data from the

Tenaris financial statements under alternative (iii).  See id. at 14.  Commerce also determined

that it was unable to calculate and apply a profit cap under alternative (iii), because Commerce did "not have home market profit data for other exporters and producers in Korea of the same general category of products."  Id. at 21.

NEXTEEL, HYSCO, Husteel, SeAH, AJU Besteel, and ILJIN (collectively, "Respondents"), challenged Commerce's Final Determination on several grounds.  Relevant to the remand, ILJIN argued Commerce did not provide sufficient explanation for Commerce's decision not to select ILJIN as a mandatory respondent, as ILJIN produces seamless OCTG and the two mandatory respondents selected produce only welded OCTG.  Husteel, 98 F. Supp. 3d at 1329.  ILJIN claimed this rendered Commerce's respondent selection unrepresentative.  Id.[6]  All Respondents contended that they were prejudiced when Commerce allowed the Tenaris financial statements to be placed on the record.  See id. at 1340, 1343–44.  They argued Commerce allowed the Tenaris financial statements on the record as rebuttal evidence, without providing any of the Respondents a sufficient opportunity to submit evidence that would have either undermined the information contained in U.S. Steel's submission or acted as an alternative CV Profit source.  Id. at 1340.  Respondents maintained, alternatively, that if the Tenaris data were properly on the record, Commerce still erred in its use of Tenaris's financial statements to calculate CV Profit.  Id. at 1337.  Finally, Respondents asserted Commerce erred in failing to apply an appropriate profit cap.  Id. at 1347.[7]

---

[6] Husteel and SeAH also challenged Commerce's mandatory and voluntary respondent selection. Husteel, 98 F. Supp. 3d at 1325.

[7] The parties made several additional challenges to the Final Determination not relevant on remand:  (1) NEXTEEL and AJU Besteel challenged Commerce's affiliation determination, Husteel, 98 F. Supp. 3d at 1349–50; (2) Maverick Tube Corporation ("Maverick") challenged

(continued . . .)

The court held that Commerce did not sufficiently explain its reasoning for the choice of NEXTEEL and HYSCO as mandatory respondents, or for its rejection of ILJIN as a mandatory respondent.  Id. at 1330–31.  The court therefore remanded the Final Determination to Commerce to further explain its mandatory respondent selection.  Id. at 1332.  The court also held that the Tenaris financial statements were improperly placed on the record as rebuttal evidence, and instead, should have been rejected as untimely.  Id. at 1341–43.  The court also determined that Respondents were prejudiced by Commerce's action improperly permitting the untimely filing of the Tenaris data and Respondents' inability to comment on the Tenaris data.  Id. at 1343–46.  Accordingly, the court remanded the CV Profit issue and instructed Commerce to either remove the Tenaris financial statements from the record or to otherwise counter the prejudice to Respondents.  Id. at 1346.  The court further instructed Commerce to either calculate a profit cap or explain its refusal to apply an appropriate profit cap.  Id. at 1349.[8]

Following the court's decision, on September 18, 2015, Commerce reopened the record to permit all interested parties to comment on the Tenaris data and submit new factual information on the issue of CV Profit (including the application of a profit cap).  Remand Results at 2, 9.  Husteel, NEXTEEL and HYSCO together, U.S. Steel, and Maverick Tube Corporation

---

NEXTEEL's hot-rolled steel coil valuation, id. at 1358; (3) U.S. Steel challenged Commerce's NEXTEEL General & Administrative expense calculation and HYSCO warranty expense calculation, id. at 1356, 1362; (4) U.S. Steel also challenged Commerce's decision not to apply adverse facts applicable under 19 U.S.C. § 1677e(b) with regard to HYSCO's short-term U.S. interest rate, id. at 1363–64; and (5) Maverick and U.S. Steel both challenged Commerce's decision not to apply adverse facts available for NEXTEEL's warranty and warehousing expenses and HYSCO's affiliated service providers, id. at 1351–52, 1360.

[8] The court rejected the other challenges made to the Final Determination, holding that Commerce's determinations were supported by substantial evidence.  Husteel, 98 F. Supp. 3d at 1336–37, 1350–51, 1353, 1354, 1356, 1357, 1359, 1362, 1363, 1365; see supra, notes 5, 6.

("Maverick") filed comments and new factual information on October 2, 2015.  Id. at 2.

Husteel's submission included the 2012 financial statements of OAO TMK IPSCO ("TMK"), a

large multinational producer of OCTG from Russia.  See id. at 21 (citing Husteel's Factual Info.

Submission and Cmts. on CV Profit at Ex. 3 at 8, Remand PD 5–12 (Oct. 2, 2015)).  Those

parties filed rebuttal comments on October 9, 2015.  Id. at 2.

        In the Remand Results, Commerce provided further explanation of its choice of

NEXTEEL and HYSCO as mandatory respondents, explaining that the decision was based on

NEXTEEL's and HYSCO's size and was in compliance with the statute.  Id. at 33.  Neither

ILJIN, nor any other party, has challenged Commerce's further explanation of the mandatory

respondent selection issue.

        With respect to CV Profit, Commerce revised its calculations and based the new

calculation on an average of the profit rates in the 2012 financial statements of Tenaris and

TMK.  Remand Results at 3.  As a result, the CV Profit rate fell from 26.11% to 16.24%.  Id.

Commerce provided further explanation for its conclusion that because non-OCTG pipe is not in

the same general category of products as OCTG, there was no home-market profit data for

Korean exporters or producers of products in the same general category as OCTG.  Id. at 22–23.

Thus, Commerce continued to conclude that no Korean producer had sales information sufficient

to calculate to a profit cap.  Id. at 22.  Commerce, however, asserts that it constructed a "facts

available profit cap" from the average of the profits in the global market (including Korea).  Id.

at 23.  Because Commerce based this calculation on the average profit rate earned by Tenaris and

TMK, Commerce's calculation with the "cap" was the same as the CV Profit rate calculation

without the cap.  Id.  As a result of these changes, NEXTEEL's revised weighted-average

dumping margin is 3.98% and HYSCO's is 6.49%.  Id. at 85.  The all others rate changed to

5.24%.  Id.

Husteel, NEXTEEL, and HYSCO argue the Remand Results are unsupported by

substantial evidence, particularly asserting that OCTG and non-OCTG pipe are in the same

general category of products, and that therefore Korean sales of non-OCTG pipe should be used

as a source of either CV Profit or profit cap data.  Pl. Husteel Co., Ltd.'s Cmts. on the U.S. Dep't

of Commerce's Feb. 22, 2016 Final Redetermination Pursuant to Ct. Remand 2–12, ECF No.

249 ("Husteel Cmts."); Cmts. of NEXTEEL & Hyundai Steel on the U.S. Dep't of Commerce's

Feb. 22, 2016 Final Redetermination Pursuant to Ct. Remand 15–16, ECF No. 252 ("NEXTEEL

& HYSCO Cmts.") (adopting Husteel's comments on this issue).[9]  Husteel, NEXTEEL, and

HYSCO also assert that Commerce held ex-parte meetings while examining Tenaris's financial

statements, and that those meetings prejudiced them.  Husteel Cmts. at 1–2 (adopting NEXTEEL

and HYSCO's comments on this issue); NEXTEEL & HYSCO Cmts. at 9–14.  These parties

further argue Commerce failed to calculate a proper profit cap.  Husteel Cmts. at 14–23;

NEXTEEL & HYSCO Cmts. at 16–25.  For these reasons, they ask the court to again remand the

Remand Results to Commerce to address these issues.

Maverick and U.S. Steel (collectively, "Petitioners") also contest the Remand Results.

Petitioners argue Commerce should not have reopened the record on remand to permit additional

CV Profit data, because Tenaris's financial data was sufficient and its prior calculation under

statutory alternative (iii) was supported by substantial evidence.  Maverick Tube Corp.'s Cmts.

---

[9] AJU Besteel and SeAH adopt Husteel's, and NEXTEEL and HYSCO's arguments.  See AJU
Besteel Cmts. on Remand Results 1, ECF No. 247; SeAH Steel Corp.'s Cmts. on Remand
Results 1, ECF No. 251.

on the U.S. Dep't of Commerce's Feb. 22, 2016 Final Results of Redetermination Pursuant to Ct.

Remand 10–11, ECF No. 245 ("Maverick Cmts.").[10]  Alternatively, Petitioners argue that if

Commerce properly reopened the record, Commerce's calculations on remand are supported by

substantial evidence.  Maverick Cmts. at 3.  Finally, Petitioners argue Commerce reasonably

interpreted the "same general category of products" to exclude Korean home-market sales of

non-OCTG as a CV Profit or profit cap data source.  Maverick Cmts. at 3–7.

        The government responds that Commerce's choice of mandatory respondents was

appropriate and lawful.  Def.'s Revised Resp. to Cmts. Regarding the Remand Redetermination

63–64, ECF No. 272 ("Gov't Resp.").  The government argues that a further representativeness

analysis is unnecessary because it has already selected respondents based on the volume of

exports in compliance with the statute.  Id.  With respect to CV Profit, the government argues

Commerce complied with the court's remand order, appropriately reopened the record, and has

complied with the statute in its calculations.  Id. at 8–33.  The government argues reopening the

record negated any prejudice from allowing Tenaris's data on the record because all parties had

an opportunity to comment and submit factual data.  Id. at 8–13.  The government further argues

that Commerce's explanation of the "same general category of products" is adequate.  Id. at 44–

50.  Although the government argues that Commerce's CV Profit rate calculation is correct, it

requests a remand to reconsider the treatment of one potential CV Profit data source.  Id. at 34–

36.  Finally, the government argues Commerce correctly calculated a CV Profit cap.  Id. at 36–

44.

_____

[10] U.S. Steel adopts Maverick's arguments.  United States Steel Corp.'s Cmts. on the U.S. Dep't
of Commerce's Feb. 22, 2016 Final Results of Redetermination Pursuant to Ct. Remand 2, ECF
No. 248.

**DISCUSSION**

**I.      Mandatory Respondent Selection**

The court previously sustained Commerce's determination in the instant case that it was

not "practicable to make individual weighted average dumping margin determinations [for each

known exporter or producer of the subject merchandise]" based on the "large number of

exporters or producers involved in the investigation."  Husteel, 98 F. Supp. 3d at 1328 (internal

brackets omitted) (quoting 19 U.S.C. § 1677f-1(c)(2)).  By statute in such instances, Commerce

may limit its examination to "(A) a sample of exporters, producers, or types of products that is

statistically valid based on the information available to [Commerce] at the time of selection, or

(B) exporters and producers accounting for the largest volume of the subject merchandise from

the exporting country that can be reasonably examined."  19 U.S.C. § 1677f–1(c)(2).  In the

Final Determination, Commerce selected mandatory respondents based on the largest production

volume under § 1677f–1(c)(2)(B).  The court remanded to Commerce for further explanation of

its decision in the light of ILJIN's arguments concerning differences between seamless and

welded OCTG production.

In the Remand Results, Commerce further explained its decision not to select ILJIN as a

mandatory respondent.  Remand Results at 24–38.  Commerce explained that by statute, it is

permitted to choose either a representative sample or the largest producers by volume.  Id. at 25.

Commerce reasoned that when it chooses the largest producers, there is an inherent

representative aspect to the choice as those producers likely make up a significant portion of the

market.  Id. at 29.  Further, Commerce explained that although ILJIN produced seamless OCTG,

the alleged differences in prices and costs between seamless and welded OCTG were

unsubstantiated, and were not on the record at the time Commerce made its mandatory

respondent selection decision.  Id. at 31–32, 37.  Finally, Commerce explained that ILJIN was

the only Korean producer of seamless OCTG and ILJIN's production was an insignificant

portion of the total OCTG imports from Korea during the POI.  Id. at 27.  None of the parties

have challenged Commerce's further explanation of its mandatory selection process and on its

face the determination is adequately explained and appears reasonable.  Accordingly,

Commerce's decision not to examine ILJIN as a mandatory respondent is sustained.

## II.     CV Profit Calculation

### A.   Procedural Issues

In challenging the Remand Results, Respondents make two procedural arguments.  First,

Respondents argue that Commerce's Remand Results are unsupported by substantial evidence

because Commerce has not complied with the court's order to remedy the prejudice caused by

Commerce's improper acceptance of the Tenaris financial statements on the record.  NEXTEEL

& HYSCO Cmts. at 5–9; Husteel Cmts. at 1–2 (adopting NEXTEEL and HYSCO's comments

on this issue).  Respondents argue that simply reopening the record and permitting all parties to

comment on and submit evidence undermining the Tenaris data and to supply new CV Profit

data was insufficient.  NEXTEEL & HYSCO Cmts. at 6–8.  They argue that only by removing

the Tenaris data from the record can the prejudice be remedied.  Id. at 9.  Alternatively, they

argue that U.S. Steel should not have been permitted to comment on the Tenaris data as the party

who originally submitted the data.  Id. at 8.  Second, Respondents argue Commerce's ex parte

meeting with Tenaris and Maverick officials on September 17, 2015, has further prejudiced them

in the proceeding.  Id. at 9–14; Husteel Cmts. at 1–2 (adopting NEXTEEL and HYSCO's comments on this issue).

In remanding the CV Profit issue, the court ordered Commerce to either "remove [the Tenaris] information from the record" or "determine if and how, at this late date, the prejudice caused by accepting the Tenaris financial statement in violation of the regulations can be rectified."  Husteel 98 F. Supp. 3d at 1346.  Commerce's decision to reopen the record and permit all parties to comment on the Tenaris data and submit additional CV Profit data was reasonable.  Part of the prejudice caused by permitting the Tenaris data on the record was that Respondents did not have the opportunity to comment on, respond to, or attempt to undermine the Tenaris data.  NEXTEEL & HYSCO Cmts. at 7 ("[T]he fundamental prejudice suffered by Respondents was that 'Commerce allow[ed] the information onto the record' without a meaningful opportunity for rebuttal.").  By permitting the parties to comment on the Tenaris data, Commerce has compensated for and adequately ameliorated the prejudice to respondents. It was well within Commerce's discretion to reopen the record on remand, see Qingdao Sea-Line Trading Co. v. United States, Slip Op. 13-102, 2013 WL 4038618, at *5 (CIT Aug. 8, 2013) (holding that Commerce may reopen the record "on remand if, in its discretion, it finds that more information is necessary to comply with the remand instructions" or when "doing so clearly advances the purposes of the remand"), and its solution to correct the prejudice, although not perfect, was reasonable in the light of the circumstances of the case.[11]

---

[11] Respondents argue that U.S. Steel, as the party who originally submitted the Tenaris data as factual information, should not have been permitted to comment on, respond to, or rebut that data.  Respondents cite 19 C.F.R. § 351.301(c) and explain that typically the party submitting factual information is not given an opportunity to submit information in support of that

(continued . . .)

Additionally, the ex parte meeting was not improper.  Commerce complied with the statute and regulations, <u>see</u> 19 U.S.C. § 1677f(a)(3), 19 C.F.R. § 351.104(b), and put a summary of the meeting on the record on September 29, 2015.  Dep't of Commerce meeting with Outside Parties at 1–2, bar code 3400382-01 (Sept. 29, 2015); <u>see</u> <u>Remand Results</u> at 68; Gov't Resp. at 51–60.  The summary of the meeting was placed on the record eight business days after the meeting, which accords with the court's precedent for timely filing summaries of ex parte meetings.  <u>See</u> <u>Hyundai Elecs. Indus. Co. v. United States</u>, 28 CIT 517, 526–27, 342 F. Supp. 2d 1141, 1150–51 (2004) (sustaining Commerce's determination where Commerce waited eleven business days to place the summary of an ex parte meeting on the record because the parties had "a meaningful opportunity to respond").  Despite the close juxtaposition between the meeting and Commerce's announcement that it would not remove the Tenaris data from the record, there is nothing to indicate that anything inappropriate occurred at the meeting or that any new factual information was submitted.  It is presumed that Commerce complies with statutes and regulations and in this case, the statute specifies that if new factual information is submitted during an ex parte meeting, it must be indicated in the summary.   <u>See</u> 19 U.S.C. § 1677f(a)(3); <u>Jazz Photo Corp. v. United States</u>, 439 F.3d 1344, 1351 (Fed. Cir. 2006) ("In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties" (quoting <u>Bernklau v. Principi</u>, 291 F.3d 795, 801 (Fed. Cir. 2002)).  Finally, after the meeting, respondents were permitted to fully comment on and submit information

---

information.  NEXTEEL & HYSCO Cmts. at 8–9.  Whatever the wisdom of Commerce's procedural choice, Commerce did not exceed its discretion in soliciting comments from all parties.

rebutting the Tenaris data.  Accordingly, Commerce did not act improperly when it permitted the

ex parte meeting and refused to remove the Tenaris data from the record.

     B.  <u>Same General Category of Products</u>

     Respondents next argue that the court should remand once more the CV Profit calculation

based on Commerce's incorrect determination that non-OCTG pipe is not in the same general

category of products as OCTG.  Husteel Cmts. at 2–12; NEXTEEL & HYSCO Cmts. at 15–16

(adopting Husteel's comments on this issue).  Respondents contend that based on this incorrect

determination, Commerce has continued to determine improperly that it could not use either

HYSCO's or any of the other Korean producers' data to calculate CV Profit.  Husteel Cmts. at

2–12.  Respondents specifically challenge Commerce's reliance on temporary market conditions

in making such determination as unreasonable and irrelevant.  Husteel Cmts. at 4–7.  They also

challenge Commerce's reliance on testing and certification requirements of OCTG and argue that

Commerce's definition of products in the same general category as limited to those used in down

hole applications is unreasonably narrow.  <u>Id.</u> at 7–12.

     On remand, Commerce further explained its determination that line pipe, standard pipe,

and other non-OCTG pipe are not in the same general category of products as OCTG, reasoning

that "[p]roducts in the same general category as subject OCTG should be of sufficient quality to

be used in 'down hole' applications."  <u>Remand Results</u> at 13.  Commerce also complied with the

court's specific instructions to address the relevance of the difference in demand in the oil

exploration and construction markets given the mutable nature of such a factor, and the relevance

of testing and certification requirements in making the same general category of goods

determination.  <u>Id.</u> at 12.  Commerce reasoned that market conditions themselves were not

probative of the same general category of goods, but rather underscored the significant

differences between the industries in which the products are used.  Id.  Commerce further

indicated that down hole pipe and non-down hole pipe serve different purposes and have

different uses, which is reflected in their different physical characteristics.  Id. at 12–14.

Commerce next explained that testing and certification requirements differ for down hole

products, such as OCTG, because they are subject to harsher conditions and more significant

external and internal pressure.  Commerce reasoned that such differences were relevant to

analyzing the physical characteristics of the products.  Id.  Finally, Commerce explained that it

had not improperly limited the definition of same general category of products to the foreign like

product because items such as drill pipe and stainless OCTG would qualify as part of the same

general category of goods, but would not meet the narrower definition of foreign like product.

Id. at 13.

        Neither the statute nor the regulations define the phrase "same general category of

products."  See 19 U.S.C. § 1677b(e)(2)(B)(i), (iii).  The Statement of Administrative Action

Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 840

(1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4176 ("SAA"), indicates that the phrase

"encompasses a category of merchandise broader than the 'foreign like product.'"  Accord Atar

S.r.L. v. United States, 730 F.3d 1320, 1328 (Fed. Cir. 2013).  Citing the definition of "general"

as "not specialized or restricted . . . not limited; diversified," Respondents argue that the use of

the term "general" indicates that the phrase should be interpreted broadly to include pipe

products not limited to down hole applications.  Husteel Cmts. at 3 (internal brackets omitted).

Under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842–43

(1984), to determine whether Commerce's interpretation of the AD statute is entitled to

deference the court conducts a two-part test.  Where Congress has spoken directly to the question

at issue, the court and Commerce must give effect to the unambiguously expressed intent of

Congress.  See id.  If, however, the statute is vague or silent on an issue, as it is here, the court

upholds Commerce's interpretation so long as the interpretation is reasonable.  See id. at 843; see

also DuPont Teijin Films USA, LP v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005).

Commerce's interpretation of same general category of products in this case as excluding

non-OCTG products is reasonable.  First, Commerce's explanation in the Remand Results that

different market demand in the oil exploration and construction industries during the POI was

not expressly relied upon in making the same general category of products determination, but

underscored the dissimilarity in the industries in which OCTG and non-OCTG pipe are used,

was reasonable.  Remand Results at 12.  Commerce explained that because differences in such

industries are not fleeting, it had not relied upon unreasonable or irrelevant criteria in making its

determination.  Id.  Rather, Commerce explained that it was reasonable to expect differences in

the industry to reflect differences in the product based on the various applications and uses of the

products in each respective industry.  Because of the significant differences in the industries,

Commerce's conclusion that non-OCTG pipe is not in the same general category of products as

OCTG was not unreasonable or unsupported.

Second, with respect to testing and certification requirements, Commerce reasonably

explained that those requirements were not expressly relied upon but helped to analyze the

physical characteristics of the products at issue.  OCTG is unquestionably a premium product

that is used in unique and often harsh environments such that OCTG products must be of

sufficiently high quality to withstand significant pressures.  See Remand Results at 12–14;

HYSCO's Suppl. Sec. D Quest. Resp. at SD-13, PD 208 (Jan. 8, 2014); Maverick Cmts. at 5.

Standard and line pipe, in part because of the uses to which they are placed, have no such

requirements.  The unique pressures to which OCTG is subjected, and highly specialized nature

of the products at issue support Commerce's determination that the products are too dissimilar to

be considered in the same general category.  The testing and certification requirements of OCTG

again highlighted the fundamental differences between the products themselves.  See Maverick

Cmts. at 5.  Accordingly, Commerce did not act unreasonably in excluding non-OCTG pipe from

its same general category of products determination.

     Contrary to respondents' arguments, limiting the same general category of products in

this case to exclude line pipe and other non-OCTG pipe does not lead to absurd results.  See

Husteel Cmts. at 6; cf. Armstrong Paint & Varnish Works v. Nu-Enamel Corp., 305 U.S. 315,

333 (1938).  Because drill pipe and stainless OCTG would qualify under Commerce's definition

of the same general category of product, but would not qualify as the foreign like product,

Commerce has not impermissibly limited the definition of same general category of products to

make it equal to or narrower than the scope of the investigation.  See Remand Results at 13;

Maverick Cmts. at 4.  Additionally, although unfinished OCTG are within the scope of the

investigation, they also qualify under Commerce's definition of the same general category of

products because although they may not be suitable for down hole applications immediately

upon sale, they are "of sufficient quality to be used in 'down hole' applications."  Remand

Results at 13, 49–50.

Respondents' reliance on certain rejected pipe's inclusion in the scope of the investigation of OCTG from Ukraine does not suggest a different result.  That certain rejected pipe was included in the scope of that investigation does not render Commerce's determination here unreasonable.  In that case, the rejected pipe was produced, entered, and sold, as OCTG.  A later determination that pipe was unsuitable for its intended use does not render Commerce's determination in this case unreasonable.  See Gov't Resp. at 49.

Commerce thus reasonably explained its analysis of market conditions and testing requirements.  Based on the differences in function, use, and industry, Commerce's determination that non-OCTG pipe is not in the same general category of products as OCTG is supported by substantial evidence.  Accordingly, Commerce's determination that the data to calculate CV Profit under alternatives (i) and (ii) were unavailable and its determination that it could not rely on the Korean producers' data under alternative (iii) are sustained.

C.  Commerce's CV Profit Calculation Under Alternative (iii)

Respondents next argue that even if Commerce did not improperly exclude non-OCTG pipe from the same general category of products, it still erred in calculating CV Profit based on the available CV Profit sources.  NEXTEEL & HYSCO Cmts. at 16–25; Husteel Cmts. at 12–14 (adopting NEXTEEL and HYSCO's comments on this issue).  Petitioners also contest Commerce's CV Profit rate calculation in the Remand Results; however, they acknowledge that if TMK's data was properly placed on the record, Commerce's CV Profit calculation should be sustained.  Maverick Cmts. at 7–8.  The government requests a partial remand to reconsider whether it properly rejected calculating CV Profit based on the profit rate in Welspun Corporation Limited's ("Welspun") financial statements.  Gov't Resp. at 34–36.  Because

Commerce reasonably evaluated the CV Profit sources available after it properly reopened the

record, Commerce's CV Profit rate calculation under alternative (iii) is sustained.

After reopening the record, Commerce had ten potential CV Profit data sources and

reasonably constructed a CV Profit rate by averaging the profits earned by Tenaris and TMK.

See Remand Results at 14–22.  The ten sources were the financial statements of:  (1) Tenaris;

(2) six Korean pipe companies; (3) four Indian pipe companies; (4) National Oilwell Varco-

Grant Prideco ("NOV"); (5) Welspun; (6) Interpipe Limited ("Interpipe"); (7) Grupo Tubos

Reunidos ("Tubos Reunidos"); (8) Arabian Pipes Company ("APC"); (9) Borusan Mannesmann

Boru Sanayi ve Ticaret; and (10) TMK.  Id. at 15.  Using the criteria laid out in the Issues and

Decision Memorandum for the Antidumping Duty Investigation of Certain Color Television

Receivers from Malaysia at 58, A-577-812, (Apr. 16, 2004), available at

http://enforcement.trade.gov/frn/summary/malaysia/04-8692-1.pdf (last visited July 27, 2016)

("(1) the similarity of the potential surrogate company's business operations and products to the

respondent; (2) the extent to which the financial data of the surrogate company reflects sales in

the United States as well as the home market [not reflecting predominantly U.S. sales]; and

(3) the contemporaneity of the data to the POI;[12]" and (4) the extent to which the customer base

of the surrogate and the respondent were similar),[13] Commerce correctly determined that the

Tenaris and TMK were the best available CV Profit sources.  As discussed below, Commerce

utilized Tenaris and TMK based on its determination that their data represented the best available

---

[12] The parties agree that the CV Profit sources are all contemporaneous to the POI.

[13] The court has previously cited favorably Commerce's reliance on the first three factors in evaluating CV Profit data sources.  See Geum Poong Corp. v. United States, 26 CIT 991, 993 (2002).

CV Profit data because as producers of predominantly OCTG, their business operations and products were most similar to those of NEXTEEL and HYSCO.

At the outset, Commerce rejected using the financial statements of the six Korean pipe companies because they sold OCTG in the United States (the alleged dumped sales) and only non-OCTG products elsewhere, which as discussed above, Commerce had reasonably determined were not sales of products in the same general category as OCTG. Remand Results at 15. Because the financial statements thus represented U.S. sales or sales of non-OCTG pipe, Commerce's determination not to rely on them in calculating CV Profit is sustained.

Next, Commerce reasonably did not use the Indian pipe companies' financial statements. Commerce declined to use Oil Country Tubular Ltd.'s statements because Commerce determined that it is a processor rather than manufacturer and did not sell products in Korea. Remand Results at 15–16. Commerce rejected using Bhushan Steel Limited's statements because they were incomplete. Id. at 16. Commerce did not use Ratnamani Metal and Tubes Ltd.'s ("Ratnamani") or Maharashtra Seamless Limited's ("MSL") financial statements because Commerce was unable to determine the portion of sales representing OCTG. Id. at 17–18. Commerce reasonably determined that Tenaris's and TMK's data were preferable based on the clear evidence that Tenaris and TMK produce predominantly OCTG and the lack of evidence as to the percent of OCTG manufactured and whether Ratnamani or MSL were likewise predominantly OCTG producers.

Similarly, Commerce determined that it would not use NOV's data because production of OCTG did "not appear to represent a significant focus or income stream for the company," id. at 18, and would not use Borusan's financial statements because it determined that Borusan did not

predominately produce OCTG, id. at 21. Based on the availability of data for producers of

predominantly OCTG, it was not unreasonable for Commerce to reject using these data sources

based on differences in the companies' products and business operations resulting from the

different relative significance of OCTG production.

With respect to Welspun's data, Commerce rejected petitioners' arguments that

Welspun's data was aberrationally low, however, Commerce did not rely on Welspun's data in

calculating CV Profit.  Id. at 18–19.  Commerce determined that because Welspun marketed

itself as a producer of line pipe, Welspun was not a producer of OCTG.  Id. at 19.  The

government and Respondents (ambiguously) request a remand to reconsider whether Welspun's

data should have been used in calculating CV Profit.  Because record evidence does not indicate

that Welspun produces any significant proportion of OCTG, Commerce's decision not to rely on

Welspun's data in its CV Profit calculation is sustained.

Commerce explained in the Remand Results that it had relied on Welspun for surrogate

value financial data in the corresponding investigation of OCTG from the Socialist Republic of

Vietnam ("Vietnam").  Remand Results at 19.  Commerce further explained that such a

determination did not conflict with its determination in this case because of the unique

circumstances of the Vietnam investigation involving a non-market economy where Commerce

was required to select the best information from a surrogate country which was economically

comparable to Vietnam that was also a significant producer of OCTG.  Id.  Based on those

limitations, Commerce selected Welspun.  Those limitations do not apply here.  The relevant

inquiry here is whether Commerce acted reasonably in relying on data from TMK and Tenaris

over Welspun in calculating the CV Profit rate.  Because there is no evidence on the record that

Welspun produced significant quantities of OCTG, as there is for Tenaris and TMK,

Commerce's determination to rely on just the two companies for which it had adequate data was

reasonable.  In fact, there is no mention of OCTG production in Welspun's financial statements

outside the glossary; instead, Welspun repeatedly refers to itself as a line pipe producer.

NEXTEEL & HYSCO Submission of CV Profit Info & Cmts. Attach. 1A at 6, 32, 42, 46, 48,

142, PD 13–27 (Oct. 2, 2015).  Thus, if the court were to remand the issue, there is nothing of

record to support inclusion of Welspun's profit data.  That U.S. Steel referred to Welspun as an

OCTG producer and argued for its use as a surrogate financial data source in the Vietnam

investigation does not indicate that Welspun produces predominantly OCTG.

        Further, the government has not stated that it erred or might have erred or failed to

consider some information.  Nor does Commerce specifically seek to reopen the record to obtain

more data.  Thus, there is no substantial concern warranting remand in this case at this late date.

See SKF USA Inc. v. United States, 254 F.3d 1022, 1029 (Fed. Cir. 2001) (holding that remand

is appropriate when an agency's concern is "substantial and legitimate"). The court thus denies

the government's request for remand to harmonize its treatment of the Welspun data in this

market economy case with its action in an unrelated non-market economy matter with a different

record.[14]  Although Respondents also request a remand on this issue, they have not indicated

what evidence not included in the 644 recorded pages submitted as a supplemental appendix at

the court's request could be submitted that would indicate that Welspun is predominantly a

---

[14] In fact, at oral argument, government counsel could not explain why such an odd request, i.e. to harmonize with another case, was made.  Commerce normally maintains that every case is different, as it depends on a particular record.

producer of OCTG.  Accordingly, Commerce's exclusion of Welspun's data from the CV Profit

calculation was reasonable in the light of the record evidence and is sustained.

Commerce next rejected using Interpipe's financial statements because for the fiscal year

ending December 31, 2012, the statements show a net loss on operations.  Remand Results at 19.

Commerce similarly rejected APC's statements based on a net loss for part of the POI and

because it was not able to determine the portion of sales relating to OCTG.  Id. at 20.  Although

the court has in the past sustained Commerce's reliance on CV Profit data reflecting a net loss,

see Floral Trade Council v. United States, 23 CIT 20, 30–31, 41 F. Supp. 2d 319, 330 (1999),

more recently the court has upheld Commerce's rejection of financial statements reflecting a net

loss.  See Fuyao Glass Indus. Grp. Co. v. United States, 27 CIT 1892, 1913–14 (2003); Rhodia,

Inc. v. United States, 26 CIT 1107, 1114, 240 F. Supp. 2d 1247, 1254 (2002).  The court is

persuaded by its more recent decisions finding such action permissible and holds that

Commerce's rejection of Interpipe and APC's financial statements as CV Profit data based on

the net loss is permissible.  Finally, Commerce next rejected Tubos Reunidos's financial

statements because they were incomplete.  Remand Results at 20.  This was reasonable based on

the availability of complete financial statements from other companies.

Not only did Commerce properly reject CV Profit data sources, it also correctly

determined that the Tenaris and TMK financial statements satisfied its criteria.  Commerce

determined that the Tenaris data indicated that it was a significant producer of OCTG, whose

substantial majority of sales were related to OCTG.  Remand Results at 16–17.  Commerce also

determined that over 50% of Tenaris's sales were made outside the United States and that it

made sales predominantly to end users.  Id. at 17.  Although Commerce also determined that it

was possible, based on the existence of a sales office in Korea, that the Tenaris data might reflect sales in Korea, id. at 17, this would seem to add little support.  Nonetheless, Commerce's determination that the Tenaris financial statement was a viable CV Profit source was thus reasonable given its stated criteria.

In analyzing TMK's financial statements, Commerce determined that TMK is a producer of a broad range of pipes, including those with premium connections that include both OCTG and drill pipe.  Remand Results at 21.  Commerce also found that TMK's financial statements describe TMK as "one of the world's leading producers of steel pipes for the oil and gas industry" whose "principal activities . . . are the production and distribution of seamless and welded pipes with the entire range of premium connections."  Id.  Further, Commerce determined that more than 75% of TMK's sales were made outside the United States and were predominantly to end users.  Id.  Accordingly, Commerce reasonably determined that TMK's data were a viable CV Profit source.

Commerce correctly noted that the statute indicates a preference in calculating CV Profit for data sources reflecting production and sales in the foreign country of the foreign like product.  Remand Results at 15.  None of the data sources on the record, however, reflected both of these preferences.  Commerce was thus forced to choose among imperfect choices and the court will not undermine such decision so long as it is reasonable.  See Lifestyle Enter., Inc. v. United States, 751 F.3d 1371, 1378, 1380 (Fed. Cir. 2014).  Because averaging the data from the two sources which best satisfy Commerce's selected factors is reasonable, Commerce acted permissibly.

D.  <u>CV Profit Cap</u>

The court instructed Commerce on remand to either calculate a profit cap pursuant to 19

U.S.C. § 1677b(e)(2)(B)(iii) or adequately explain why it was unable to do so.  The court further

instructed that if Commerce determined it could not calculate a profit cap under 19 U.S.C.

§ 1677b(e)(2)(B)(iii), Commerce needed to attempt to calculate a profit cap based on facts

available.  On remand, Commerce has complied with the court's instructions.

Commerce determined that because there was no evidence on the record of "the amount

normally realized by exporters or producers . . . in connection with the sale, for consumption in

the foreign country, of merchandise that is in the same general category of products as the

subject merchandise," i.e., sales of pipe suitable for use in down hole applications in Korea, it

could not calculate a profit cap pursuant to § 1677b(e)(2)(B)(iii).  <u>Remand Results</u> at 22–24

(quoting 19 U.S.C. § 1677b(c)(2)(B)(iii)).  Because that determination was based on its decision

that non-OCTG pipe is not in the same general category of products as OCTG, which the court

has already sustained, Commerce's determination that it could only calculate a facts available

profit cap is also supported by substantial evidence.  The court normally defers to Commerce's

selection of the best available information when Commerce is forced to rely on facts available.

<u>See</u> <u>Allied-Signal Aerospace Co. v. United States</u>, 996 F.2d 1185, 1191 (Fed. Cir. 1993).

Commerce explained that after reviewing the available data, a reasonable facts available

profit cap would be the average of the profits in the global market, including Korea.  <u>Remand</u>

<u>Results</u> at 23.  Commerce calculated the average of the profits in the global market by averaging

the profits earned by Tenaris and TMK.  <u>Id.</u>  Thus, the resulting facts available profit "cap" was

the same as Commerce's CV Profit rate without the "cap."  <u>See</u> <u>id.</u>

Respondents argue that Commerce has once again failed to lawfully apply the statutory profit cap requirement.  Husteel Cmts. at 14–23; NEXTEEL & HYSCO's Cmts. at 25 (adopting Husteel's comments on this issue).  They argue that a "cap" is "an upper limit; a ceiling" and that by using the same data to calculate the profit cap as the CV Profit rate, Commerce has rendered meaningless the statutory requirement to cap profits under alternative (iii).  Husteel Cmts. at 15– 16.  Respondents argue that Commerce frustrated the purpose of the profit cap requirement, which is to impose a reasonableness check on the CV Profit rate so that it bears some relation to the home market experience of the respondents at issue.  Id. at 17.  They argue this is particularly important in a case such as this where one of the CV Profit data sources includes an extremely high profit rate.  Id. at 17–19.  Respondents further argue that Commerce could have calculated a proper profit cap based on the profit of the six Korean producers whose data was on the record or could have based the cap solely on TMK's data.  Id. at 17, 19–23.  They argue that because Commerce resorted to a facts available profit cap, there was no requirement that the sales be of products in the same general category as OCTG and thus could have reasonably included the Korean producers' data.  Id. at 21.  Alternatively, they argue using only TMK's data would be more appropriate than the profit "cap" Commerce calculated because its profit is more in line with the Korean producers' profits.  Id. at 22–23.

Maverick argues Commerce did not need to calculate profit cap because there was no information available to do so.  Maverick Cmts. at 8–10.  Maverick reasons that because there was no information for sales in the same general category of products as OCTG in Korea, there were no facts available from which to calculate a profit cap.  Id. at 8–9.  Alternatively, Maverick

argues that if Commerce was required to calculate a facts available profit cap even where no facts were available, Commerce's calculation was reasonable.  Id. at 9–10.

The court is not persuaded that Commerce has in fact capped the CV Profit rate. Respondents argue that Commerce should have calculated a profit cap based on the rejected Korean data, but Husteel acknowledges that the Federal Circuit appeared to approve Commerce's selection of a "profit cap" that was the CV Profit rate in Atar, 730 F.3d at 1328–29. See Husteel Cmts. at 16 n.10.  That was not the holding of the Federal Circuit.  The Federal Circuit did not say that whenever Commerce resorts to alternative (iii) it may dispense with any attempt to consider whether the profit rate was at all possible in the home market and to thereby dispense with a profit cap.  The court does not accept Commerce's tautology that selecting as a "cap" the same rate without the "cap" is a reasonable interpretation of the statute and SAA's profit cap requirement; rather a non-cap is not a cap.

Here, Commerce's failure to cap the profit rate, however, was reasonable based on the record.  Commerce was faced with a difficult decision as all of the information on the record had imperfections, and the court is not persuaded that any of the "caps" suggested by Respondents fulfill the statute any better than no cap.[15]  The parties here focused on construction of a fair CV

---

[15] The court is not convinced that Commerce was required to exclude Tenaris's data from its attempted profit cap calculation.  Although the Tenaris profit rate was very high, Respondents' arguments that Commerce should have based the profit cap on TMK's data alone are unpersuasive.  That TMK's profit rate is closer to that of the Korean producers and U.S. producers is not sufficient reason to compel Commerce to use only that data, particularly in the light of the deference Commerce is permitted in facts available situations.  See Allied-Signal Aerospace Co., 996 F.2d at 1191.  The same is true of Respondents' arguments that Commerce was permitted to use the Korean producers' data as a facts available profit cap even though those sales were not of OCTG.  Merely because Commerce could have relied on such data in

(continued . . .)

Profit rate as they should have.  That rate may not be correct, but that it is all there is.  In essence,

Commerce valued the similarity in product over the need for a profit cap, and the court cannot

say that Commerce's failure to do more to construct a profit cap was unreasonable on this record.

Accordingly, Commerce's CV Profit calculation is sustained.

## III.   Cash Deposit Rates

Finally, Respondents contend that Commerce has failed to rectify the effect of the

prejudice they suffered as a result of Commerce's improper actions in permitting Tenaris's

financial statements to be placed on the record because Commerce has failed to revise the cash

deposit rates based on rates determined using that prejudicial information.  See NEXTEEL &

HYSCO Cmts. at 25–27.  The government responds that it would not be proper to revise the cash

deposit rates at this time because the rates underlying the cash deposits remain subject to

ongoing litigation and Commerce has not filed an amended final determination.  Gov't Resp. at

61–62.  Although the court now sustains Commerce's revised dumping rates of 6.49% (down

from 15.75%) for HYSCO, 3.98% (down from 9.89%) for NEXTEEL, and 5.24% (down from

12.82%) for all others, nothing in the statute nor regulations requires Commerce to revise cash

deposit rates before it issues a final amended determination.  See 19 U.S.C.

§§ 1673d(c)(1)(B)(ii), 1673e(a).  The statutory injunction in this case prevents Commerce from

liquidating entries other than in accordance with the final and conclusive court decision in the

litigation, including all appeals and remand proceedings.  Once litigation is completed and

---

calculating a profit cap does not render Commerce's determination unsupported by substantial
evidence.  See id.  All of Commerce's options were problematic and utilizing the CV Profit rate,
although not capped, was not unreasonable.

Commerce issues an amended final determination, the cash deposit rates will be adjusted and any

excess deposits will be refunded, with interest.

The proper method for seeking the relief respondents seek likely would be a motion for

injunctive relief from the collection of cash deposit rates.  Such remedy, however, is

extraordinary, and the court is hesitant to grant such relief in the absence of a specific request

and it may not do so without a showing of irreparable harm or some extraordinary circumstances.

See Inland Steel Bar Co. v. United States, 18 CIT 14, 15, 16, 843 F. Supp. 1477, 1478, 1479

(1994) (denying injunctive relief to revise cash deposit rates where dumping rate was reduced

from 12.69% to 4.59% after a remand); but see GPX Int'l Tire Corp. v. United States, 70 F.

Supp. 3d 1266, 1272–78 (CIT 2015) (granting relief from cash deposits where respondents made

showing that cash deposit rates did not comply with court's judgment).  That Commerce

originally erred is not an extraordinary circumstance.  Accordingly, Commerce's determination

not to revise the cash deposit rates until conclusion of the litigation is sustained.  The best result

for all parties and the best remedy for prior prejudice, at this juncture, is to proceed to the

conclusive decision expeditiously, an end served by denying any further requests for remand.

## CONCLUSION

For the foregoing reasons, Commerce's Remand Results are sustained in their entirety.


                                                              /s/ Jane A. Restani
                                                            Jane A. Restani
                                                                Judge


Dated: August 2, 2016
          New York, New York